2015 CO 29

**Miriam BEREN and Robert Goodyear, Jr., in his capacity as Personal Representative of the Estate of Sheldon K. Beren, Petitioners**

and

**Concerning Joshua Beren, Dena Grossman, and The Estate of Cheryl Feldberger,**

v.

**David BEREN, Respondent/Cross–Petitioner:**

**Zev Beren, Jonathan Beren, Daniel Beren, and Generation Skipping Trust and the Trustees of said trust, Respondents**

**Supreme Court Case No. 13SC127**

Supreme Court of Colorado.

May 11, 2015
Rehearing Denied June 15, 2015

Attorneys for Petitioner Miriam Beren: Hale Westfall, LLP, Richard A. Westfall, Peter J. Krumholz, Aaron Solomon, Denver, Colorado

Attorney for Petitioner Robert M. Goodyear, Jr.: Carver Schwarz McNab Kamper & Forbes, LLC, Peter C. Forbes, Denver, Colorado

Attorneys for Joshua Beren, Dena Grossman, and The Estate of Cheryl Feldberger: Sweetbaum Sands Anderson PC, Alan D. Sweetbaum, Katherine K. Kust, Denver, Colorado

Attorneys for Respondent/Cross–Petitioner David Beren: Blain Myhre LLC, Blain D. Myhre, Englewood, Colorado

Attorneys for Respondents Zev Beren and Jonathan Beren: Fairfield and Woods, P.C., Charles F. Brega, Lee Katherine Goldstein, Scott T. Rodgers, Denver, Colorado, Wade Ash Woods Hill & Farley, P.C., James R. Wade, Denver, Colorado

No appearance by or on behalf of Daniel Beren.

JUSTICE HOBBS delivered the Opinion of the Court.

¶ 1 We granted certiorari to consider whether, and to what extent, the Colorado Probate Code displaces a probate court's authority to award an equitable adjustment supplementing a spouse's elective share of the decedent's estate.[1] This case involves

---

1. We granted certiorari in *In re Estate of Beren,* 2012 COA 203M, — P.3d —, *as modified on denial of rehearing* (Feb. 14, 2013), to review the following issues:

1. Whether the court of appeals erred by holding, as a matter of law, that the Probate Code displaces the authority of the probate court to award an equitable adjustment sup-

the probate court's protracted administration of an estate that, by date of final distribution, had grown in value from $73 million to more than $250 million. Concluding that it would be unfair for the elective share to be "frozen in time" while extensive litigation concerning its computation eroded its value in relation to the appreciating estate, the probate court exercised its equitable authority by supplementing the elective share. The probate court determined that the spouse was entitled to an elective share of approximately $26 million, plus an equitable award of approximately $24.5 million, based on a 17.46% rate of return on the undistributed balance of her elective share, calculated to reflect appreciation and income to the entire estate. The court of appeals reversed the trial court's decision, ruling that the Probate Code displaces a court's equitable powers in the elective-share arena as a matter of law. *In re Estate of Beren*, 2012 COA 203M, ¶ 21, —— P.3d ——, *as modified on denial of reh'g* (Feb. 14, 2013). The court of appeals ordered the spouse to repay the entire $24.5 million equitable award, plus restitutionary interest from the date of distribution. *Id.* at ¶ 143, 155–56.

¶ 2 Reading the elective-share statutes together with the probate court's equitable authority, we conclude that the Colorado Probate Code's plain language demonstrates that a particular statutory provision dealing with the spouse's elective share, section 15–11–202(1), C.R.S. (2014), fixes the value of the property comprising the augmented estate on the decedent's date of death. This specific provision controls over the general equitable authority the probate court may

exercise under section 15–10–103, C.R.S. (2014). Accordingly, the probate court erred by linking its equitable award to appreciation and income to the entire augmented estate. Nevertheless, section 15–10–103 expressly reserves the probate court's equitable authority to the extent that it is not displaced by a specific statutory provision. On remand, the probate court has tools at its disposal to exercise equity consistent with the statutory elective-share framework. For example, the probate court may award interest or assess administrative expenses to take into account undue delay in distributing the elective share.

¶ 3 We affirm in part and reverse in part the judgment of the court of appeals and remand this case for further proceedings consistent with this opinion. We set aside the court of appeals' judgment requiring the spouse to repay the entire $24.5 million equitable award with interest. The probate court shall determine on remand what equitable relief is available to the spouse under the specific facts of this case. The probate court, in its discretion, may take additional evidence and argument, and may order further relief and enter a final judgment consistent with this opinion.

### I.

¶ 4 Sheldon K. Beren ("Mr. Beren") died testate in 1996. He was survived by his wife of twenty-eight years, Miriam Beren ("Mrs. Beren"); his four sons from his previous marriage, David Beren, Zev Beren, Jonathan Beren, and Daniel Beren ("the four sons" [2]); two children from Miriam's previous mar-

---

plementing a spouse's elective share of the decedent's estate.

2. Whether the court of appeals created a grave injustice by invalidating the equitable adjustment in isolation and ordering the petitioner, Miriam Beren, to return $24.5 million, plus interest, completely disregarding that the equitable award was integral to administering the estate over the course of 15 years.

3. Whether the court of appeals' conclusion that interest on the repayment of the equitable adjustment cannot be awarded under a statute but instead only on restitution principles (1) conflicts with *Rodgers v. Colorado Department of Human Services*, 39 P.3d 1232 (Colo.App.2001), and *Tuscany, LLC v. West-*

*ern States Excavating Pipe & Boring, LLC*, 128 P.3d 274 (Colo.App.2005), both of which awarded statutory interest on funds that had to be repaid following reversal of judgments on appeal, and (2) misinterprets section 5–12–106, C.R.S. (2012), which requires payment of statutory interest on judgments reversed on appeal.

2. Daniel Beren did not participate in the brothers' appeal before the supreme court. To the extent this opinion discusses David, Zev, and Jonathan Beren's arguments on certiorari, this opinion will refer to that group as "the three sons."

riage, whom Mr. Beren had adopted, Joshua Beren and Cheryl Beren Feldberger, who is now deceased; and one daughter from Sheldon and Miriam's marriage, Dena Beren Grossman. Mr. Beren was the founder and sole shareholder of the oil and gas company Berenergy Corporation, the estate's largest asset. In his will, Mr. Beren gave a life estate in most of his assets to his wife (in the form of a qualified terminable interest property trust ("QTIP trust")) and gave the residuary estate to the seven children, leaving management of the estate to his wife and Robert Goodyear ("the personal representative"), an officer of Berenergy. Shortly after the will was admitted to probate, Mrs. Beren petitioned to take her statutory elective share in lieu of the life estate.[3]

¶ 5 In January 2000, Mrs. Beren petitioned the probate court to determine the value of the augmented estate[4] and, based on that value, the amount of her elective share.[5] The four sons objected to her proposed calculation. For the next nine years, Mrs. Beren and the four sons contested the value of the augmented estate and the consequent value of her elective share, as well as the court's proposed exercise of equity. Due to these protracted legal disputes and the fact that the estate experienced substantial earnings during the litigation, the probate court determined that it would be unjust to freeze Mrs. Beren's elective share while litigation prevented complete distribution and eroded its value in relation to the appreciating estate. Specifically, in December 2003, the court observed that "because the estate has experienced earnings during the pendency of this litigation, equity requires the Court provide Mrs. Beren an award."

¶ 6 In June 2007, recognizing that "both the accumulation of excessive administration costs, as well as the passage of excessive time, have distorted the value of the elective share in this estate," the probate court found that Mrs. Beren was entitled to an equitable adjustment to her elective share. The court determined that the estate was holding assets—including the spouse's elective share—that were appreciating over time and was also receiving income from its ownership of those assets. The court also determined that, but for unanticipated delay caused by persons other than herself, Mrs. Beren would have received the full balance of her elective share much earlier and would have been able to benefit from the same appreciation the estate experienced.

¶ 7 The probate court directed the personal representative to prepare dual valuations of estate appreciation and income. Specifically, in August 2009, the probate court explained that it had directed the personal representative to

> determine values of the estate on May 1, 2000 and December 31, 2007 and calculate a rate of return during that period. It was the Court's intention that the calculation *account for appreciation of assets and income to the estate* over the selected period. The Court also intended that the calculation would result in a single sum that would be awarded to the widow to adjust for the inequities occasioned by the delays in final distribution to her of the entire elective share.

(Emphasis added.) The personal representative retained two appraisers whose methodologies had already been confirmed as reliable by the court. Relying on these expert opinions, the court adopted a 17.46% internal rate of return, compounded monthly, which it applied to the undistributed balance of Mrs. Beren's elective share between May 1, 2000,

**3.** After Mrs. Beren decided to take her elective share, Robert Goodyear continued as the sole personal representative for the remainder of the probate proceeding.

**4.** As formulated in the Probate Code, the augmented estate is composed of the sum of four elements: (1) the value of the decedent's net probate estate; (2) the value of the decedent's nonprobate transfers to others; (3) the decedent's nonprobate transfers to the surviving spouse; and (4) the surviving spouse's property

and nonprobate transfers to others. *See* § 15–11–203, C.R.S. (2014).

**5.** The delay between choosing the elective share and petitioning to determine its value resulted from the Internal Revenue Service audit process. On May 12, 1997, the personal representative filed the federal estate tax return Form 706 and paid the federal and state estate taxes then due. On June 14, 1999, the IRS, having completed its audit process, issued its closing letter.

and December 31, 2007. The court awarded Mrs. Beren this equitable remedy in addition to her statutory elective share.

¶ 8 Following a hearing scheduled to facilitate quantification of the equitable adjustment, the court made specific findings supporting its exercise of equity:

> [T]he decedent's children would be enriched at the expense of their mother if they were allowed to delay the distribution of the full elective share for over a decade, force distribution of cash to their mother while they took "in kind" distributions, or continually reduce the value of the elective share by increasing administrative expenses through delay and obstruction.

The probate court emphasized in its orders that "[i]t would be unfair for Mrs. Beren's share to be 'frozen in time' so that all of the external events over which she had no control could erode her share." Applying "principles of equity," the probate court determined that Mrs. Beren was entitled an equitable award of approximately $24.5 million, based on the 17.46% rate of return on the undistributed balance of her elective share, in addition to her elective share of approximately $26 million. The court allocated the equitable award pro rata against each of the seven children's shares.[6] In 2010, after the probate court entered a final order approving the plan of distribution and closing the estate, the four sons appealed.

¶ 9 The court of appeals set aside the probate court's equitable adjustment. *Estate of Beren*, ¶ 14. The court acknowledged that the probate court had equitable power under section 15–10–103, to the extent that the Probate Code had not displaced such power. *Id.* The court nevertheless concluded that the exercise of equity in this case was "at odds" with two provisions of the Probate Code. *Id.* First, section 15–11–202(1) fixes the value of an elective share at a pecuniary amount determined by the value of the decedent's estate upon the date of death and is not subject to increases and decreases in the estate's

value during probate administration. *Estate of Beren*, ¶¶ 22–25. Second, section 15–1–467(1), C.R.S. (2014), requires an executor to pay over any net probate income to trustees and legatees, neither of which includes an electing spouse. *Estate of Beren*, ¶ 26. As such, the court reasoned, the Probate Code displaced the probate court's power in equity to grant an equitable award exceeding the amount that the elective-share statutes provided. *Id.* at ¶ 27.

## II.

¶ 10 Reading the elective-share statutes together with the probate court's equitable authority, we conclude that the Colorado Probate Code's plain language demonstrates that a particular statutory provision dealing with the spouse's elective share, section 15–11–202(1), fixes the value of the property comprising the augmented estate on the decedent's date of death. This specific provision controls over the general equitable authority the probate court may exercise under section 15–10–103. Accordingly, the probate court erred by linking its equitable award to appreciation and income to the entire augmented estate. Nevertheless, section 15–10–103 expressly reserves the probate court's equitable authority to the extent that it is not displaced by a specific statutory provision. On remand, the probate court has tools at its disposal to exercise equity consistent with the statutory elective-share framework.

### A. Standard of Review

¶ 11 We review de novo questions of law concerning the construction and application of statutes. *Hickerson v. Vessels*, 2014 CO 2, ¶ 10, 316 P.3d 620, 623. Where the interaction of common law and statutory law is at issue, we acknowledge and respect the General Assembly's authority to modify or abrogate common law, but we only recognize such changes when they are clearly expressed. *Id.* Unless a conflict with the

---

**6.** Although Mrs. Beren and her three children asked that the award be allocated entirely against the four sons, the probate court declined, explaining that the equitable remedy was not a punitive sanction targeting "bad people" and rewarding "good people." During the hearing on the calculation of the equitable award, the court emphasized that its action was "not a punitive award": "I was trying to make an adjustment that I thought was reflective of my responsibility to do equity in an estate."

statute exists, the pre-existing common law continues to apply. *Id.* To the extent that two statutory provisions conflict with each other, they should be construed, if possible, to give effect to both. *Young v. Brighton Sch. Dist. 27J,* 2014 CO 32, ¶ 16, 325 P.3d 571, 577 (citing § 2–4–205, C.R.S. (2014)). If different statutory provisions cannot be harmonized, the specific provision controls over the general provision. *Telluride Resort & Spa, L.P. v. Colo. Dep't of Revenue,* 40 P.3d 1260, 1265 (Colo.2002); § 2–4–205 ("If the conflict between the provisions is irreconcilable, the special ... provision prevails....").

■■■ ¶ 12 The power to fashion equitable remedies lies within the discretion of the trial court. *Lewis v. Lewis,* 189 P.3d 1134, 1140 (Colo.2008). We will not disturb such rulings on review absent an abuse of discretion. *Id.* at 1141. A trial court necessarily abuses its discretion if its ruling is based on an erroneous view of the law. *People v. Voth,* 2013 CO 61, ¶ 15, 312 P.3d 144, 148. We defer to a trial court's findings of fact so long as they are supported by the record. *People ex rel. A.J.L.,* 243 P.3d 244, 249–50 (Colo.2010).

### B. The Colorado Probate Code's Elective–Share Framework

¶ 13 The Colorado Probate Code, §§ 15–10–101 to 15–17–103, C.R.S. (2014), is modeled on the Uniform Law Commissioners' Uniform Probate Code ("UPC"), which Colorado originally adopted in 1974. The Probate Code grants a surviving spouse the right to elect against the decedent's will and claim an elective share. § 15–11–202. The elective share is a percentage of an amount called the "augmented estate," and the percentage increases with the length of the marriage, up to a maximum of fifty percent. § 15–11–203, C.R.S. (2014). The augmented estate is the sum of the value of all property from: (1) the decedent's net probate estate; (2) the decedent's nonprobate transfers to others; (3) the decedent's nonprobate trans-

fers to the surviving spouse; and (4) the surviving spouse's property and nonprobate transfers to others. *Id.* All of those property values are calculated based on their "fair market *value as of the decedent's date of death.*" § 15–11–201(11) (emphasis added).

¶ 14 Colorado's 1994 elective-share amendments brought its Probate Code into line with major revisions to the UPC. In revising the elective share, the framers of the UPC, and thus Colorado's General Assembly, set out to better reflect the contemporary view of marriage as an economic partnership. *See* tit. 15, art. 11, pt. 2, gen. cmt. p. 202, C.R.S. (2014) (adopting verbatim the general comment to the UPC). Under this approach, the economic rights of each spouse derive from an unspoken marital bargain, under which the partners agree that each will enjoy a half interest in the fruits of the marriage. *Id.* at 199–200. A decedent who disinherits the surviving spouse fails to uphold that bargain. *Id.* at 200; *see also* Restatement (Third) of Prop.: Wills & Other Donative Transfers § 9.2 cmt. a (2003).

■■■ ¶ 15 Whereas the earlier version of Colorado's elective-share statutes gave a surviving spouse the right to elect a fraction of the assets comprising the augmented estate, with the amount determined on the date of distribution, the amended provisions specify that the elective share is a pecuniary amount calculated as of the decedent's date of death.[7] *Compare* ch. 186, sec. 1, § 15–11–201(1), 1981 Colo. Sess. Laws 911, 911 ("[T]he surviving spouse has a right of election to take a *fraction* of the augmented estate ...." (emphasis added)), *with* ch. 178, sec. 3, § 15–11–201(1), 1994 Colo. Sess. Laws 969, 980 ("The surviving spouse ... has a right of election ... to take an elective-share *amount* not greater than one-half of the *value* of the augmented estate." (emphasis added)), *and id.* § 15–11–202(1)(a)(XII), 983 (defining "value" as "fair market value as of the decedent's date of death").[8] The significance of these

---

7. The pecuniary amount is based on both liquidated and unliquidated assets. Nothing in the Probate Code limits a probate court's ability to award cash, in-kind assets, or both when distributing a spouse's elective share.

8. Colorado further amended its provision describing the pecuniary elective-share amount in 2014 to mirror changes to the UPC. *See* ch. 296, sec. 2, § 15–11–202(1), 2014 Colo. Sess. Laws 1220, 1222. As revised, the statute specifies that the elective-share amount is always fifty percent,

changes is that, where the elective share is computed as a fraction of the augmented estate, it participates in appreciation or depreciation during estate administration. But where, as here, the elective share is based on a pecuniary value determined at time of death, it does not participate in increases and decreases to the estate during administration. *See, e.g., In re Estate of Parker,* 24 Mich.App. 158, 180 N.W.2d 82, 85 (1970) (explaining that the difference between a fractional and pecuniary amount is important because it determines whether appreciation or depreciation of assets during probate will affect that amount).

¶ 16 The revisions to Colorado's elective share effectuate the partnership theory of marriage by ensuring that the surviving spouse of a ten-year or longer marriage will receive fifty percent of the augmented estate valued on the decedent's date of death. This principle assumes that each spouse contributed equally to the partnership (i.e., marriage) and recognizes that the partnership terminates when one spouse dies. That is why the revised statutes value the partnership's property on the date the partnership ends; what happens to a deceased spouse's assets is irrelevant to the surviving spouse.

¶ 17 We agree with the court of appeals that, by virtue of the determination to be made of a pecuniary amount at the date of decedent's death, the Colorado Probate Code does not allow the elective share to fluctuate with the estate's value during probate administration.[9] We now turn our attention to whether the statutory provisions setting the value of the elective share at the decedent's date of death displace a probate court's authority to base an equitable remedy on appreciation and income to the estate during its administration.

### C. Principles of Equity Reserved Under the Colorado Probate Code

¶ 18 Colorado merged its courts of law and equity during its early days of statehood. *Hickerson,* 316 P.3d at 623. The purpose of a court sitting in equity is to promote and achieve justice with some degree of flexibility, according to the particular circumstances of each case. *Garrett v. Arrowhead Improvement Ass'n,* 826 P.2d 850, 855 (Colo.1992); *see also In re Estate of Fuller,* 862 P.2d 1037, 1039 (Colo.App.1993) (stating that where no legal remedy is adequate, "equity may then intervene to fashion a remedy"); *Fed. Deposit Ins. Corp. v. Mars,* 821 P.2d 826, 832 (Colo.App.1991) (echoing the equitable maxim that "[t]here can be no wrong without a remedy"). Equity plays a critical role in providing a probate court with authority to account for the unique circumstances of a particular proceeding and to ensure that parties are treated fairly and the decedent's will is upheld. *See, e.g., In re Estate of Leslie,* 886 P.2d 284, 287 (Colo.App. 1994) (affirming assessment of administrative costs and fees incurred by the estate against a particular party despite the lack of a specific provision authorizing such action). Indeed, the Probate Code is "equitable in nature." *Id.*

¶ 19 The General Assembly granted probate courts broad equitable jurisdiction. *See* § 13–9–103(3), C.R.S. (2014) ("The court has jurisdiction to determine every legal and equitable question arising in connection with decedents', wards', and absentees' estates...."). In addition, section 15–10–103

---

but it is fifty percent of the *marital-property portion* of the augmented estate, which increases along with the length of the marriage. *Id.* ("The surviving spouse ... has a right of election ... to take an elective-share *amount* equal to fifty percent of the value of the marital-property portion of the augmented estate." (emphasis added)). The purpose of this revision is to present the elective-share's implementation of the partnership theory of marriage in a direct rather than indirect form. *See* tit. 15, art. 11, pt. 2, gen. cmt. p. 202, C.R.S. (2014).

Mrs. Beren's elective share would have been computed identically under either version of the statute. For the purposes of our analysis in this opinion, we refer to the current 2014 version of the statute.

9. The probate court also recognized this. In its order of September 23, 1999, the court acknowledged that a surviving spouse is not entitled as a matter of law to income on the elective share under the existing Probate Code. Consequently, the court expressly reserved its equitable powers to make a supplementary award based upon specific facts that justify additional compensation in favor of this particular spouse.

of the Probate Code instructs that, "[u]nless displaced by the particular provisions of this code, the principles of law and equity supplement its provisions." This section thus preserves the common law and equitable powers the probate court traditionally exercised before adoption of the Probate Code, unless a particular provision displaces that authority.

¶ 20 No Colorado case specifically addresses the operation of the term "displaced" in the context of the probate court's equitable authority. In *Lunsford v. Western States Life Insurance*, however, we considered the comparable question of when the Probate Code displaces the probate court's common law authority. 908 P.2d 79, 80–81 (Colo.1995). In that case, we concluded that the Probate Code's "slayer statute" provision did not preempt common law principles barring payment of life insurance policy proceeds to the insured's murderer. *Id.* at 87–88. We observed that "[s]tatutes in derogation of the common law must be strictly construed, so that if the legislature wishes to abrogate rights that would otherwise be available under the common law, it must manifest its intent either *expressly or by clear implication*." *Id.* at 87 (emphasis added) (quoting *Van Waters & Rogers, Inc. v. Keelan*, 840 P.2d 1070, 1076 (Colo.1992)). We emphasized this presumption against preemption by specifying that a provision of the Probate Code will displace a court's common law powers when there has been "explicit legislative direction" to do so. *Id.; see also Vigil v. Franklin*, 103 P.3d 322, 329 (Colo.2004) (explaining that we recognize modifications to the common law when the legislature has "clearly and manifestly expressed its intent, through the plain language of the statute").

¶ 21 Applying the canons of statutory interpretation, when analyzing a specific provision that conflicts with a general provision, our first task is to attempt to give effect to both provisions. § 2–4–205. However, if the conflict between the two is irreconcilable, the special provision controls over the general one. *Id.* Therefore, we determine that particular provisions of the Probate Code displace a court's general equitable authority when an exercise of equity conflicts with the plain language of that specific provision and the two cannot be reconciled.

## D. Application to This Case

¶ 22 We determine that the probate court's equitable authority must be read and applied in conjunction with the specific provisions of the elective-share statutes.

### 1. The Colorado Probate Code Displaces a Probate Court's Equitable Power to Tie a Remedy to How the Augmented Estate's Property Performed After the Decedent's Death

¶ 23 The plain language of a specific provision of the Probate Code, section 15–11–202(1), displaces a probate court's authority to change the date on which it values the property in the augmented estate. We conclude that the probate court abused its discretion by using appreciation and income to the estate to calculate an equitable adjustment to the surviving spouse's elective share.

¶ 24 The probate court stated that it intended the equitable adjustment to replicate the estate's increase in value during probate administration: "It was the Court's intention that the calculation account for appreciation of assets and income to the estate over the selected period." The court calculated a rate of return on the value of the entire augmented estate between May 1, 2000 (the date at which it found the elective share should have been determined and distributed), and December 31, 2007 (the date the court deemed the distribution date, even though the estate was not completely distributed until 2010). The court then applied that rate of return to the undistributed balance of Mrs. Beren's elective share, compounded monthly between those dates, resulting in a $24.5 million equitable adjustment. But by selecting the elective share, Mrs. Beren chose to treat the marriage's property as a partnership, subject to the statutory framework.

¶ 25 However, the Colorado Probate Code sets a particular formula for calculating an elective share and states a specific time at which property values for the augmented estate are measured: the decedent's date of death. *See* §§ 15–11–201 to –208, C.R.S.

(2014). Fixing the elective share's valuation on a specific date signifies that fluctuating estate values do not affect the elective-share proceedings. Here, by tying its equitable adjustment to how the estate's assets performed during probate administration, the probate court—contrary to Colorado's 1994 Probate Code amendments rejecting the fractional share theory—attempted to preserve the spouse's fractional interest in the increasing value of the augmented estate. Thus, the equitable remedy the probate court chose conflicts with the Code's plain language basing the elective share amount on the value of property in the augmented estate on the decedent's date of death. *See* §§ 15–11–201(11), –202(1). The probate court cannot tie an equitable remedy to the augmented estate's appreciation or depreciation after the date of a decedent's death in an elective-share proceeding. Because the equitable remedy in this case was based on the increase in value of the entire estate, we conclude that its exercise of equity irreconcilably conflicts with the Code's plain language.

¶ 26 In this case, the augmented estate's amount substantially increased in the years following Mr. Beren's death because the value of many of its assets—especially oil and gas assets—grew. As of the date of this opinion, the price of oil has dropped, which likely decreased the value of the assets in this estate. The volatile nature of the value of these assets illustrates the General Assembly's intention to base valuation of the estate's assets on the decedent's date of death, not on how the assets perform subsequently. Doing so, depending on the circumstances, could prevent a surviving spouse from obtaining fifty percent of the marital-property portion of the augmented estate if the value of the properties in the augmented estate decreased below their value as of the decedent's date of death. Adhering to that date as a bright line for valuation guarantees that the surviving spouse obtains the benefit of the marriage bargain.

¶ 27 Therefore, the plain language of a particular statutory provision dealing with the spouse's elective share, section 15–11–202(1), disallows the probate court from basing an equitable remedy on how the aug-

mented estate performs after the decedent's death. A contrary view would remove the "date of death" phrase in the definition of "value." *See* § 15–11–201(11). By tying the equitable adjustment to the entire augmented estate's rate of return years after Mr. Beren's death, the probate court's exercise of equity conflicted with the definition of "value," which anchors the elective share to the valuation of assets at the decedent's date of death.

## 2. Forms of Equitable Relief Available

¶ 28 We decline to adopt the three sons' extreme position that the Probate Code displaces all equitable authority in an elective-share proceeding. The Probate Code explicitly provides for situations where equity may supplement its provisions. *See* § 15–10–103. But the three sons' argument contravenes both the letter and intent of this provision by preventing a probate court from ever exercising equity in an elective-share case. We must give effect to all provisions of a statute whenever feasible. *See Young*, 325 P.3d at 577. The Probate Code recognizes the unique nature of the marital relationship, and its elective-share provisions are intended to put the decedent's spouse in a privileged position, with greater rights than residual beneficiaries. Yet the Probate Code cannot anticipate every possible scenario, and for that reason, the statute reserves the probate's court's traditional equitable authority. *See Lunsford*, 908 P.2d at 85 (explaining that in section 15–10–103, "[t]he General Assembly provided guidance in determining the legal standards that apply to situations not covered by the statutory scheme of the Colorado Probate Code"). We emphasize that cases meriting such an exercise of equity will be rare, because the Code normally operates in favor of prompt disposition of estate matters. This case is an exceptional one where failure to invoke equity would lead to injustice.

¶ 29 The probate court correctly determined that use of its equitable authority was necessary to the disposition of this case. During the lengthy course of the proceedings, the court made numerous findings supporting an exercise of equity. The court

found that "both the accumulation of excessive administration costs, as well as the passage of excessive time, have distorted the value of the elective share in this estate." In 2009, following a two-day evidentiary hearing to determine calculation of the equitable adjustment, the court made three specific findings that the "decedent's children would be enriched at the expense of their mother" if they were allowed to (1) "delay the distribution of the full elective share for over a decade," (2) "force distribution of cash to their mother while they took 'in kind' distributions,"[10] and (3) "continually reduce the value of the elective share by increasing administrative expenses through delay and obstruction."

¶ 30 Thus, the unique nature of the Beren estate, combined with inordinate delay, excessive administrative expenses, and difficulties associated with evenly distributing corporate assets, created a situation where mechanistic application of the elective-share statutes in isolation would lead to a highly inequitable outcome. Although the probate court erred by tying Mrs. Beren's equitable adjustment to increases in value of the entire augmented estate after her husband's death, there is ample factual support in the record supporting the probate court's ability to exert the authority granted to it under section 15–10–103 to fashion an equitable remedy consistent with the Probate Code's plain language. The probate court has a range of equitable tools at its disposal to avoid the injustice that would result from excluding all equitable remedies in this case as a matter of law. These tools include the following for the probate court's consideration on remand from our decision when crafting an appropriate remedy.

### a. Administrative Expenses

¶ 31 In dealing with administrative expenses, the probate court determined that "[a]ll administrative expenses" would be included in the general computation of administrative expenses, regardless of whether they were "occurring outside of the control of the surviving spouse or reasonable and necessary to the administration of any estate of this size and complexity." The court acknowledged that this would "distort[ ]" the value of the elective share as it existed on the decedent's date of death, but it intended to address that distortion through the equitable adjustment. Therefore, the court's decision to apportion the estate administration costs in this way hinged on the critical assumption that it had authority to award an equitable adjustment to the statutory elective share.

¶ 32 Specifically, section 15–11–203 dictates that the value of the augmented estate includes the value of the decedent's probate estate, reduced by administrative and certain other expenses. In other words, an electing spouse receiving fifty percent of the augmented estate will also be responsible for fifty percent of the administrative expenses. Administrative expenses in this case totaled $276,225.20 in 1996 but had ballooned to $16,783,615.50 by final distribution of the estate in 2010. Importantly, although the Probate Code provides that the property comprising the augmented estate is valued at the time of death, the administrative expenses component continues to increase during probate—i.e., its value is not, and cannot, be determined based upon the date of death. In this extremely prolonged case, the estate's rising administrative expenses consumed a significant portion of the augmented estate, thereby reducing Mrs. Beren's elective share by over $8 million compared to its value on the date of her husband's death.

¶ 33 No particular provision in the Probate Code displaces a probate court's au-

---

10. The difficulties surrounding distribution of the shares in Berenergy led the personal representative—and ultimately the probate court—to threaten complete liquidation of the in-kind assets, which would have resulted in significant tax consequences for the residual beneficiaries. The solution the personal representative eventually adopted was to give Mrs. Beren her share in cash and divide Berenergy and related assets among the children. In its June 19, 2008 order, the probate court explained that it carefully considered its power to order a complete liquidation of the estate to "insure fairness to all of the takers" and "eliminate any conflict over whether the distributions by the Personal Representative to the devisees are fair." However, weighing the probable intent of the decedent, the court ultimately adopted the personal representative's plan to avoid complete liquidation.

thority to grant an equitable adjustment based on excessive administrative expenses not attributed to a spouse's actions in an elective-share proceeding. While the phrase "date of death" in the statutory definition of value, § 15–11–201(11), displaces a probate court's ability to grant an equitable remedy based upon appreciation and income to the augmented estate, there is no evidence that the administrative expenses here were connected to the increase in value of the estate. Further, while the value of the property comprising the augmented estate must be ascertained based upon date of death—and therefore the estate's performance after that date cannot be considered in an elective-share proceeding—administrative fees cannot be ascertained as of date of death because they continue to increase during estate administration.

¶ 34 While the statute's plain language dictates that administrative costs must be deducted from the augmented estate, as they were in this case, nothing in the Code precludes a probate court from granting an equitable adjustment based upon excessive administrative fees when justice so requires. The record supports the probate court's finding that excessive administrative expenses unfairly impacted Mrs. Beren's elective share. Under the extraordinary circumstances of this case, the probate court retains equitable authority to account for the unfair burden of administrative expenses.

¶ 35 On remand, the probate court may award Mrs. Beren an equitable remedy based upon the excessive administrative expenses in this case.

### b. Equitable Award Based on Reasonable Rate of Return to Undistributed Balance of the Elective Share

¶ 36 The probate court's equitable authority can also include an award to compensate a surviving spouse for delay in the elective share's distribution. The Probate Code plainly indicates the General Assembly's policy choice in favor of prompt distribution of the elective share. However, final disposition of an estate may involve delay caused by the necessity to address issues other beneficiaries raise in the case. Here, the delay in calculating and distributing the elective share prevented Mrs. Beren from utilizing the cash and/or in-kind assets to which she was legally entitled. While interest is usually a creature of statute, the probate court may use its equitable authority to ensure that a party receives the true value of her or his elective share when distribution has been unduly delayed.

¶ 37 In this case, the probate court was justified in concluding that an exercise of equity was necessary to "compensate a party for an inordinate delay in receiving a distribution to which she is entitled." If not for the objections and ensuing litigation, the court found the estate "could have been administered and distributed after 4 years" but instead took almost fifteen years.[11] The court specifically recognized the delay caused by the four sons in its orders addressing its exercise of equity. For example, in its December 15, 2003 order, the court found that "the lack of cooperation of the [four sons] was an impediment to the administration of the estate's assets." The court concluded that "[i]t would represent a windfall to the other devisees, all of whom participated in the litigation that has delayed the final settlement and distribution, to have the entire benefit of [the estate's appreciation and income] allocated to their distributions." Notably, the court never found that the delay was the result of any action on the part of Mrs. Beren.

¶ 38 If the estate had been settled on a timely basis, there would not have been sufficient cash to fulfill Mrs. Beren's elective share. The means that her elective share could have been satisfied through a combination of cash and oil and gas assets that would have shared in the same appreciation and income the estate experienced during probate. Because years of litigation concerning the elective-share calculation delayed its distribution, Mrs. Beren was not able to benefit from investing the cash and/or enjoying the

11. Additionally, in its January 10, 2006 order, the probate court observed that "this case is approaching the decade marker and will soon be the oldest unresolved decedent's estate on this Court's docket."

benefit of the in-kind assets she would have received. Her elective share was not separated from the rest of the estate, so she was a de facto investor, who—under the court of appeals' analysis—would have been unable to reap the benefit of her investment. The record supports the probate court's finding that, without an equitable remedy, the children would have been unjustly enriched at the expense of their mother because they hindered the distribution of her elective share and then used that amount to further benefit the estate's assets and, ultimately, their own financial well-being.

¶ 39 Colorado's Probate Code is based on uniform law. Case law from other jurisdictions that have also adopted the UPC informs our decision regarding the probate court's equitable authority to award interest on an elective share when distribution has been unduly delayed. For example, a New York court concluded that its law authorized an award of interest to compensate a surviving spouse for delay in the distribution of her elective share, relying on principles of equity to reach the just result. *See In re Kasenetz*, 196 Misc.2d 318, 320, 765 N.Y.S.2d 216 (N.Y.Sur.Ct.2003) ("[T]he delay in distribution [of the elective share] inures to the benefit of the residuary beneficiaries and the loss of use of the money inures to the detriment of the spouse. There is neither equity in this position nor is there incentive for the fiduciaries to distribute to the surviving spouse what the law determines to be hers in an expeditious fashion...."). That court reasoned that refusing to supplement the pecuniary elective-share amount with statutory interest "would unjustly enrich the estate and diminish the value of the elective share." *Id.* at 321, 765 N.Y.S.2d 216.

¶ 40 In the case before us, the Probate Code does not provide for statutory interest on a delayed elective-share distribution.[12] But the probate court's authority to ensure that a party receives the full value of the money it is legally due is not restricted to an award of statutory interest. *See, e.g., Farmers Reservoir & Irrigation Co. v. City of Golden*, 113 P.3d 119, 132–33 (Colo.2005) (observing that the doctrine of moratory interest relied on the concept of interest as damages and unjust enrichment as a basis for awarding common law interest rather than statutory interest); *Bankers Trust Co. v. Int'l Trust Co.*, 108 Colo. 15, 113 P.2d 656, 665 (1941) (allowing interest to be assessed as damages when interest was not recoverable by statute). The court of appeals determined that the equitable adjustment was not justified as an award of moratory interest because the probate court did not make the requisite finding of wrongful withholding. *Estate of Beren*, ¶ 39. However, even in the absence of a wrongful withholding, the probate court made sufficient findings to justify an equitable remedy to compensate for the excessive delay that deprived her of property to which she was legally entitled.

¶ 41 The statutory interest rate has traditionally functioned as a legislative policy choice regarding the value of money, in order to avoid prolonged factual disputes in each and every case coming before our courts. *See Rodriguez v. Schutt*, 914 P.2d 921, 929 (Colo.1996) (recognizing that statutory interest is meant to preserve the time value of money). The 17.46% interest rate the probate court selected as an equitable adjustment was based on the overall performance of the augmented estate's assets during pro-

---

12. A recent amendment to the UPC, section 2–209(e), provides for statutory interest on a delayed elective-share distribution. Colorado adopted this provision in the 2014 legislative session. *See* ch. 296, sec. 2, § 15–11–209(4), 2014 Colo. Sess. Laws 1220, 1229. Section 15–11–209(4), C.R.S. (2014), now provides:

**Unsatisfied balance treated as general pecuniary devise.** The unsatisfied balance of the elective-share ... amount ... is treated as a general pecuniary devise for purposes of section 15–12–904, but interest shall commence to run one year after determination of the elective share amount by the court. This subsection (4) applies only to estates of decedents who die on or after August 6, 2014.

Treating the undistributed balance of the elective share as a general pecuniary devise allows that amount to accrue interest according to the statutory directives for general pecuniary devises. However, this statute was not in force on Mr. Beren's date of death and thus does not apply here. Regardless, it would not have addressed the inequities in this case because interest only begins to accrue one year after the court determines the elective-share amount, which did not occur until 2009, after years of delay.

bate administration and, therefore, cannot be the basis for an equitable remedy on remand. This does not mean, however, that the probate court cannot make an equitable award based on the reasonable rate of return on the undistributed portion of Mrs. Beren's elective share during probate administration. Tying an equitable award to the statutory rate of interest that the General Assembly already recognizes is within the trial court's discretion. *See, e.g., Roberts v. People,* 130 P.3d 1005, 1010 (Colo.2006) (noting that the criminal restitution statute did not require any specific prejudgment interest rate, but that the civil interest rate of eight percent, while not controlling, appeared reasonable and appropriate under the circumstances). Accordingly, on remand, the probate court may grant Mrs. Beren an equitable award based on a reasonable rate of return on the assets to which she was entitled—the undistributed portion of her elective share.

### E. Interest on the Repayment of the Equitable Adjustment

¶ 42 Finally, we affirm the court of appeals' conclusion that interest on Mrs. Beren's repayment of her equitable adjustment cannot be awarded pursuant to statute but instead only under restitution principles, subject to countervailing equitable considerations. *See Estate of Beren,* ¶¶ 146–56.

¶ 43 David Beren argues that the general interest statute entitles him to interest on Mrs. Beren's repayment of the probate court's equitable award. Section 5–12–106(1)(b), C.R.S. (2014), provides for postjudgment interest when a matter is reversed on appeal. It states in relevant part:

> If a judgment for money in a civil case is appealed by a judgment debtor and the judgment is modified or reversed with a direction that a judgment for money be entered in the trial court, interest, as set out in subsections (2) and (3) of this section, shall be payable from the date a judgment was first entered in the trial court until the judgment is satisfied and shall include compounding of interest annually.

David Beren claims that the court of appeals construed the postjudgment interest statute too narrowly when it excluded him, a rival claimant of the assets of an estate in distribution, from being considered a "judgment debtor." Instead, he argues, we should consider him the "functional equivalent" of a judgment debtor and grant him an award of statutory interest. However, we have instructed that the language of section 5–12–106 "must be strictly construed by the court," and that "[i]f the statute is clear and unambiguous on its face, then the court need look no further." *Sperry v. Field,* 205 P.3d 365, 367 (Colo.2009).

¶ 44 The court of appeals correctly concluded that this statute does not apply here because a judgment debtor has not appealed and the court did not direct that a money judgment be entered upon remand. *See Estate of Beren,* ¶ 151. A judgment debtor is "[a] person against whom a money judgment has been entered but not yet satisfied." Black's Law Dictionary 921 (9th ed. 2009). The probate court did not order David Beren to pay a judgment to Mrs. Beren. Rather, the probate court ordered the estate to pay Mrs. Beren, and any distribution that she must return goes back to the estate, not David Beren individually. Accordingly, David Beren is not a judgment debtor under the plain language of section 5–12–106(1)(b), and he is not entitled to statutory interest.

¶ 45 Interest is also not appropriate under section 5–12–102, C.R.S. (2014). Section 5–12–102(1)–(3) codified the doctrine of moratory interest in contract and property damage cases. *Farmers Reservoir,* 113 P.3d at 133. However, this case is not a contract or property damage case; it is a probate case. Our case law clarifies that, as a precondition to a wrongful withholding, there must be a party who has acted wrongfully in the legal sense, e.g., a party has breached a contract. *See Mesa Sand & Gravel Co. v. Landfill, Inc.,* 776 P.2d 362, 364–66 (Colo. 1989) (collecting cases). There has been no "wrongful withholding" here because Mrs. Beren did not breach a contract, nor has she damaged physical property.

¶ 46 David Beren alleges that the court of appeals' opinion conflicts with *Rodgers v. Colorado Department of Human Services,* 39

P.3d 1232 (Colo.App.2001). We disagree. In *Rodgers,* the court of appeals awarded interest pursuant to section 5–12–102 in a case involving a lawsuit between a state employee and his employer, where the court was satisfied that the employee was a breaching party who wrongfully obtained money from the state agency. *Id.* at 1238. *Rodgers* is therefore distinguishable from this case because here no court ever found wrongful withholding or a breaching party. Accordingly, *Rodgers* does not provide support for an award of interest on Mrs. Beren's repayment of the equitable adjustment.

¶ 47 Nevertheless, interest may be granted on equitable grounds, pursuant to the Restatement (First) of Restitution § 74 (1937), which provides:

> A person who has conferred a benefit upon another in compliance with a judgment, or whose property has been taken thereunder, is entitled to restitution if the judgment is reversed or set aside, unless restitution would be inequitable....

Comment d to that section explains that, "upon reversal of the judgment the payor is entitled to receive from the creditor the amount thus paid *with interest.*" (Emphasis added.)

¶ 48 Section 74 provides for restitution "unless restitution would be inequitable." Therefore, on remand, the probate court shall consider, and may, in its discretion, take additional evidence on whether equitable considerations reduce or eliminate Mrs. Beren's obligation to repay interest to the estate.

### Conclusion

¶ 49 A probate court's traditional powers in equity supplement and reinforce the statutory directives of the Colorado Probate Code. Where those two sources of authority intersect, particular provisions of the Probate Code displace a court's general equitable authority when an exercise of equity irreconcilably conflicts with the statute's plain language. Probate courts retain authority under section 15–10–103 to exercise equity in those unusual elective-share cases that warrant it, as long as that exercise does not conflict with the statutory language.

¶ 50 We conclude that the Colorado Probate Code's plain language demonstrates that a particular statutory provision dealing with the spouse's elective share, section 15–11–202(1), fixes the value of the property comprising the augmented estate on the decedent's date of death. This specific provision controls over the general equitable authority the probate court may exercise under section 15–10–103. Accordingly, the probate court erred by linking its equitable award to appreciation and income to the entire augmented estate. Nevertheless, section 15–10–103 expressly reserves the probate court's equitable authority to the extent that it is not displaced. On remand, the probate court has tools at its disposal to exercise equity consistent with the statutory elective-share framework.

### III.

¶ 51 Accordingly, we affirm in part and reverse in part the judgment of the court of appeals and remand the case for further proceedings consistent with this opinion. We set aside the court of appeals' judgment requiring the spouse to repay the entire $24.5 million equitable award with interest. The probate court shall determine on remand what equitable relief is available to the spouse under the specific facts of this case. The probate court, in its discretion, may take additional evidence and argument, and may order further relief and enter a final judgment consistent with this opinion.

JUSTICE HOOD does not participate.